## BRADFORD–KENNEDY CO. v. FRED G. CLARK CO.

### No. 8749.

Circuit Court of Appeals, Eighth Circuit.
Sept. 15, 1930.

Yale C. Holland, of Omaha, Neb. (J. A. C. Kennedy, G. L. DeLacy, and Charles F. McLaughlin, all of Omaha, Neb., on the brief), for appellant.

Clinton Brome, of Omaha, Neb. (William L. Randall and T. J. McGuire, both of Omaha, Neb., on the brief), for appellee.

Before STONE and VAN VALKENBURGH, Circuit Judges, and OTIS, District Judge.

OTIS, District Judge.

This is an action brought by the plaintiff below, appellee here, to recover a balance due on lubricating oils alleged to have been sold appellant pursuant to an oral agreement.

The petition alleges that the fair and reasonable value of the goods sold was $14,379.92; that appellant had paid $7,513.88 on account; that the balance due was $6,866.04, for which, with interest, judgment was asked. A verdict for appellee in the amount of $8,321.95 was directed by the trial court on its own motion.

1. It is, of course, well settled that in a proper case the trial judge may direct a verdict either for the plaintiff or defendant. It is his duty to do that "when the testimony and all the inferences which the jury reasonably may draw therefrom would be insufficient to support a different finding." Chicago M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 478, 46 S. Ct. 564, 566, 70 L. Ed. 1041; Baltimore & Ohio Ry. Co. v. Groeger, 266 U. S. 521, 524, 45 S. Ct. 169, 69 L. Ed. 419. "If the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party." Slocum v. New York Life Ins. Co., 228 U. S. 364, 369, 33 S. Ct. 523, 525, 57 L. Ed. 879; Delk v. St. Louis & San Francisco R. R. Co., 220 U. S. 580, 587, 31 S. Ct. 617, 55 L. Ed. 590; Empire State Cattle Co. v. A., T. & S. Fe Ry. Co., 210 U. S. 1, 10, 28 S. Ct. 607, 52 L. Ed. 931, 15 Ann. Cas. 70. The view that a scintilla or modicum of conflicting evidence, irrespective of the character and nature of that to which it is opposed, necessarily requires a submission to the jury has been expressly disapproved. A. B. Small Co. v. Lamborn & Co., 267 U. S. 248, 254, 45 S. Ct. 300, 69 L. Ed. 597.

Evidence is conclusive to the extent required in the rule stated when reasonable men considering it can reach but one conclusion from the evidence. Chicago G. W. Ry. Co. v. Price (8 C. C. A.) 97 F. 423, 427.

While under the federal decisions the rule is the same whether a verdict is directed for plaintiff or defendant, there is obviously in the former case one matter to be considered which need not be considered in the latter, and that is the credibility of the witnesses. The credibility of witnesses is certainly, at least speaking generally, a matter for the jury. That fact is without significance when a verdict is directed for the defendant. Then the court assumes the witnesses for plaintiff have testified truthfully. The court gives full weight and value to their testimony and holds that it is insufficient to establish a cause of action. In that case the court does not invade the province of the jury by passing on the credibility of witnesses, and the losing party cannot complain. It is not so, however, when a verdict is directed for plaintiff. The assumption then that the plaintiff's witnesses have testified truthfully is an exercise of a plain jury function, and it is an assumption which must be made before a verdict can be directed. The court, directing a verdict for defendant, in effect says to plaintiff: "Whether your witnesses have testified truthfully or falsely, you have not made a case," but directing a verdict for plaintiff the court in effect says: "Your witnesses have testified truthfully and have made a case."

Because of this distinction, courts in some jurisdictions have held that a verdict may not at all be directed for a plaintiff. But the distinction does not justify such a complete denial of the court's power, and it has never been either denied or questioned in the federal courts. There may be nothing in the conduct and demeanor of witnesses or in their testimony, and nothing to be drawn from all the facts and circumstances in evidence which would affect their credibility, and therefore nothing to warrant submission of that issue. The correct rule would seem to be that the court should not direct a verdict for the plaintiff, even although otherwise it ought to be directed, if reasonable men might differ as to the credibility of witnesses upon whose testimony plaintiff's case depends.

2. In this case then our inquiry must go into all the evidence. We must determine from all the evidence whether, in the sense of the applicable rule, it was conclusive in favor of the appellee's cause of action as to every essential element thereof and also whether there was nothing to submit to the jury touching the credibility of the witnesses. As a preliminary to that inquiry it is necessary to have in mind clearly what were the essential elements of the appellee's case.

The theory of the appellee's case was that appellant and appellee entered into an oral contract by which appellee agreed to pay appellant for such goods as appellant should order from appellee, and appellee agreed to ship to appellant such goods as it should order; that pursuant to this contract the appellee did ship to appellant goods of the total value of $14,379.92, which appellant duly received, and that there is a balance due in the amount of $6,866.04, with interest. The essential elements of the case are these: (1) That such a contract was entered into; (2) that the appellant did order goods under the contract; (3) that they were shipped and

delivered to the appellant or at its direction to another; and (4) that there was a balance due. Such were the elements of the appellee's case which must have been so completely proved that no reasonable man could say upon all the evidence that a single one of them was not conclusively proved by credible testimony.

3. We proceed then to consider whether the first of these essential elements was conclusively proved. Was it indisputably proved that such an oral contract was entered into between appellant and appellee as appellee asserts?

The appellee, the Fred G. Clark Company, was a wholesaler of lubricating oils, whose home office was in Cleveland, Ohio. The Bradford-Kennedy Company, appellant, whose principal place of business was in Omaha, Neb., was and for years had been engaged in the business of selling lumber. It had never engaged in the business of selling lubricating oils. D. C. Bradford was president of the Bradford-Kennedy Company. In 1922, when this case had its beginning, and for sometime prior to that date, Bradford was in failing health and was able to give only slight attention to the business of his company. Since his youth he had known and for sentimental reasons had taken some interest in one C. D. Bennison, who in 1922 was about forty years of age, had not been successful and was then without resources. Bennison had had some experience as an oil salesman and was seeking financial assistance toward engaging in the oil business for himself. In that situation he thought of and consulted his friend and benefactor, Bradford. Previously he had been in touch with one W. G. Dickey, who was a salesman for the Fred G. Clark Company.

The contention of the appellee is that the oral contract relied on by it was entered into between Dickey, representing the appellee, and Bradford, president of the appellant company, representing the appellant, in the presence of Bennison. At the time of the trial Bradford was deceased. Dickey and Bennison testified.

According to the testimony of Dickey, the conversations between himself and Bradford, which resulted in the oral contract, took place on two days, August 21 and 22, 1922. The conversation on August 21 was detailed by Dickey as follows: "After I was introduced to Mr. Bradford, Mr. Bradford stated that they were in the oil business and that Mr. Bennison was a very good salesman; that it would be satisfactory for Mr. Bennison to make up an initial order for the stock and asked that he do so and that we come back the following day with the order and he would look it over and sign it. As we walked out of the door Mr. Bradford placed his arm on my shoulder and said I need not worry about finances; that if necessary they would back the proposition as far as $200,000 or more."

Dickey testified that after the conversation on August 21st with Mr. Bradford he and Bennison went to a hotel and figured out an initial order for stock. On the next day, August 22d, that order was taken by him and Bennison to Bradford who thereupon signed it. It was an order for four carloads of oils.

The conversation between Dickey and Bradford at the second meeting on August 22d was thus stated by Dickey in his testimony: "At this second interview Mr. Bradford stated that it would be all right for us to bill the Bradford-Kennedy Company and to send them the invoices; that Mr. Bennison had no finances and no credit rating and they would pay us for the oils; I told him that was true; that our company would have to have something to know we were going to receive our money for the goods, and knowing that Mr. Bennison had no finances, and no credit, we would look to Bradford-Kennedy for the payment. He said that would be satisfactory, for us to bill the Bradford-Kennedy Company and to send them the invoices."

Since it appeared that what Dickey had thus testified had reference to the first order which Mr. Bradford had signed, he was then asked specifically whether at that time Mr. Bradford said anything about further orders, to which he replied: "He said that he knew nothing about the oil business; that Mr. Bennison did and that Mr. Bennison was privileged to order what oil he considered necessary."

Excepting this last statement made by Dickey, there was nothing in his testimony indicating any commitment by Bradford either for himself or the Bradford-Kennedy Company as to orders for oil to be made by Bennison after the initial order which Bradford signed. As we have noted, this alleged commitment was said by Dickey to have been made on August 22 or at the second interview between himself and Bradford.

Bennison's version of the conversation between Bradford and Dickey differed with Dickey's testimony in important details.

As to the conversation on August 21, at the first interview between Bradford and

Dickey, Bennison testified that after the formal introduction of Dickey to Bradford, Bradford said to Dickey: "Well, we are in the oil business. Now, Mr. Dickey, what is required to start up in the business because at the present time Mr. Bennison is very anxious to start out and get into the September business for the fall business without going into any details about partnership or incorporating."

After this opening, Bennison testified that Bradford suggested to Dickey that "we immediately start in business as a branch of the Bradford-Kennedy Company until further notice." And that Bradford said further to Dickey: "You and Mr. Bennison go ahead and make up your orders for oil and whatever he orders we are back of it, and we started out of the office and he said, 'Mr. Dickey, Mr. Bennison will give you the orders.'"

According to Bennison the foregoing was the whole conversation between Dickey and Bradford so far as it involved language tending to prove any contract for orders other than the initial order signed by Bradford. Bennison testified that on the second day, August 22, at the second interview between Bradford and Dickey, there was no conversation at all concerning the business between them.

The discrepancies between the testimony of Dickey and that of Bennison will be noted. Dickey testified that on August 22 Bradford agreed in effect that the Bradford-Kennedy Company would pay for whatever future oils Bennison might order, and that Bennison was privileged to order what he considered necessary. But that was not corroborated by Bennison, who denied there was any conversation touching the subject at the interview on August 22. On the other hand, Bennison's testimony as to what was said at the first interview on August 21 was not corroborated by Dickey. According to the latter, Bradford's statements at the first interview had reference only to the initial order. At that first interview, according to Dickey, Bradford said "it would be satisfactory for Mr. Bennison to make up an initial order for the stock," whereas Bennison testified that Bradford said, "you and Mr. Bennison go ahead and make up your orders for oil and whatever he orders we are back of it." From such inconsistent testimony a definite conclusion as to what was said by Bradford to Dickey cannot well be drawn. Yet, so far as direct testimony in the case goes, there is no other proof of the oral con-

tract, conclusive proof of which was essential to appellee's case.

There was much in the evidence to make doubtful the credibility of Bennison and much also indicating the improbability of vital parts of both Dickey's and Bennison's testimony.

At one time on cross-examination Bennison testified that at the conference with Dickey on August 21st, Bradford said to Dickey that as to future orders that would be taken up with Dickey on his next trip. Later he withdrew this correction of his earlier testimony and reaffirmed what he had before said.

There was testimony that Bennison in describing to others the conversation between Dickey and Bradford on August 21st had said that Bradford told Dickey that, as to future orders, they would be discussed upon Dickey's next trip by which time he (Bradford) expected that a separate organization for the handling of oil business would have been established. Several witnesses testified to statements by Bennison to this effect.

Bennison was an impecunious salesman who had no monetary resources of his own. As we have before noted, on August 21, 1922, Bradford had practically retired from business because of a serious physical disability from which in a short time he died. He was then able to devote only a few minutes each day to business affairs. While for sentimental reasons growing out of an obligation he was under to the parents of Bennison who had aided and befriended him in his youth, Bradford was anxious to aid Bennison in securing a start in business, he would only intrust him with relatively small amounts of money. With such an attitude toward Bennison on Bradford's part shown quite clearly by the evidence, it would seem unreasonable that he would give Bennison carte blanche to order goods from the appellee on appellant's credit as he (Bennison) chose to order them. The probability of both Bennison's and Dickey's testimony is made doubtful by these facts.

There was testimony that, on the day before the interview between Dickey, Bennison, and Bradford, both Dickey and Bennison had said to one Plamondon that they had arranged "to meet Bradford the next day to see whether they could get him to stand good for an initial shipment of oil to the Bennison Oil Company." They said nothing to Plamondon of a purpose of inducing Bradford to commit not only himself but his company to

standing good not only for an initial shipment of oil but for any subsequent shipments Bennison might order. There was much testimony in the case to indicate that Bradford's understanding of the agreement was that in his individual capacity he was standing good for an initial shipment of oil, but that he had never agreed to obligate either himself or his company as to future shipments. An outstanding fact suggesting that such was Bradford's understanding was that Bradford never consulted with his fellow officers and directors in the appellant company touching this adventure nor advised them that he had involved the company in a new enterprise and one wholly foreign to its usual business.

Considering all of the testimony it seems to us there was a question of fact as to whether the oral contract relied upon by the appellee ever was entered into, and that that question of fact should have been submitted to a jury. In our view, the evidence was not so conclusive for appellee that it can be said that reasonable men might not well have reached a contrary conclusion. That there was such a question of fact was recognized by the appellee at the trial. The appellee did not ask for a directed verdict at the close of all the testimony, but requested the court to submit to the jury the question whether the oral contract relied on actually had been entered into between appellee and appellant.

Appellant was certainly at a great disadvantage at the trial. The death of its president before the trial left it without a witness who could testify directly as to the conversations said to show the contract. It was compelled to base its defense upon circumstances, upon inconsistencies in the testimony of appellee's witnesses, upon matters affecting their credibility. In such a case a verdict should be directed for a plaintiff only if the facts undoubtedly and clearly bring it within the applicable rule. The significance of such a situation, where inconsistencies have been developed in the testimony of witnesses for a party, where some circumstances at least are against that testimony, and where the only witness for the opposing party is dead, was pointed out by this court in Chicago G. W. Ry. Co. v. Price (8 C. C. A.) 97 F. 423, 424, 432. The syllabus epitomizes the views there expressed in this language: "Although the testimony of a witness upon an issue is not contradicted, where the only person who could have contradicted him is dead, and it is shown that the witness gave inconsistent testimony on a previous occasion, it is proper to submit the issue to the jury." See, also, Bloomingdale et al. v. Southern National Bank of New York, 63 App. Div. 72, 71 N. Y. S. 306, 309; Clark v. Public Service Electric, 86 N. J. Law, 144, 91 A. 83, 85; Aquino v. Morris County Traction, 93 N. J. Law, 233, 106 A. 802, 107 A. 427, 429.

The judgment below is reversed, and the case remanded for a new trial.

VAN VALKENBURGH, Circuit Judge, concurs in the reversal of this case upon the sole ground that the state of the evidence required submission to the jury.